CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

July 29, 2024

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | |
|---|---|
| BRANDI FUNKHOUSER, ADMINISTRATOR of the ESTATE of KACEY HORN, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| KAITLYN BROWN, ET AL., | ) ) ) |
| Defendants. | ) |

**Case No. 5:22-cv-056**

**By:    Michael F. Urbanski
Senior United States District Judge**

<u>**MEMORANDUM OPINION**</u>

On February 14, 2022, Kacey Horn was brought on pre-trial detention to the Rappahannock, Shenandoah, and Warren County Regional Jail ("RSW") in Warren County, Virginia, where she attempted to commit suicide four times in 36 hours. As a result, RSW transferred her to Western State Hospital ("Western State") for psychiatric treatment. Eleven days later, she returned to RSW and died by suicide the next day. This is a 42 U.S.C. § 1983 and wrongful death action brought against correctional officers at RSW and a mental health services provider regarding their alleged failures to respond to Horn's risk of self-harm when she returned from Western State, resulting in her death.

Brandi Funkhouser—Horn's mother and administrator of her estate—initiated this action by filing a complaint on September 30, 2022. Compl., ECF No. 1. After conducting discovery, Funkhouser filed an amended complaint that replaced all defendants (except one) with five new defendants. ECF No. 57. Pending now are two motions to dismiss the amended complaint, filed by the five new defendants. ECF Nos. 79, 82. Following careful consideration

of the parties' arguments and the relevant caselaw, defendants' motions to dismiss are **DENIED**.

## I.  BACKGROUND

When Horn was brought to RSW on pre-trial detention on February 14, 2022, RSW conducted an initial health screening, where she tested positive for methamphetamine, amphetamine, and fentanyl, and was placed on RSW's opiate withdrawal protocol.[1] At the screening, Horn indicated that she had bipolar disorder, that she had been under the care of a mental health professional, and that she had attempted suicide by hanging several months earlier. Two days later, on February 16, 2022, RSW staff found Horn with a sheet tied around her neck kneeling in front of her cell door. She had red marks around her neck and was having a seizure. RSW called EMS for a seizure and suicide attempt, and Horn told staff that she "did not want to be here anymore." Horn was taken to the hospital and returned to RSW that same day. When she returned, she said, "I want to kill myself, are you sending me to Western State?"

Later that day, Horn was found sticking her fingers down her throat, stating, "I want to drown[] myself in it." The next morning, on February 17, 2022, Horn was found wrapping a suicide smock around her neck and later was found unconscious. When she was awoken by ammonia inhalants, staff observed her attempting to regurgitate medications she had been given, urinating on herself, and "yelling and screaming." She was given medication intramuscularly at 9:10 a.m., which calmed her initially, but staff called a medical emergency at

---

[1] These facts are taken from Funkhouser's amended complaint, ECF No. 57, accepted as true and construed in the light most favorable to Funkhouser for purposes of the motions to dismiss. See <u>Wikimedia Found. v. Nat'l Sec. Agency</u>, 857 F.3d 193, 208 (4th Cir. 2017).

10:35 a.m. because Horn had "stuck her head in the toilet and tried to drown[] herself." RSW staff then put her in a "dry cell."

Due to her multiple suicide attempts, a Temporary Detention Order ("TDO") was issued, and she was sent to Western State on the afternoon of February 17, 2022. At the hospital, she "was noted to have a history of schizophrenia, pseudo seizures, and severe substance abuse disorder." Western State assessed her as "high risk" for self-harm and treated her with antipsychotic and antidepressant medications. Horn reported that she was sexually abused as a child, had a history of using heroin to cope with her suicidal ideation, and had attempted suicide on three occasions while incarcerated in 2021. Western State also documented an attempted suicide by hanging several months prior to her arrest. Horn told medical staff at Western State that she thought about killing herself daily and that she experienced hallucinations from a childhood friend named Sally, who told her to hurt herself and others.

During her eleven days at Western State, Horn's mood stabilized, and staff determined that she could be monitored outside the hospital setting. On February 28, 2022, Horn was discharged from Western State, and she returned to RSW. The discharge paperwork stated that Horn was being discharged with a ten-day supply of medication and was "encouraged to follow up with the Northwestern Community Services Board (NWCSB) for case management and psychiatric services." Western State's discharge paperwork also included a psychiatric discharge note, in which Western State instructed RSW staff to engage in "frequent" checks due to Horn's risk of self-harm:

> [Horn] [h]as convincingly contracted for safety and demonstrated
> the ability to maintain safety over the course of the past several

> days. Patient is at chronically elevated risk for harm to self—including deliberate self-harm, low risk for harm to others including intentional violence, low risk for vulnerability to harm, and low risk for inability to care for self in the context of stat card inpatient jail with the addition of frequent (Q15 to 30 minute) checks.

Frequent checks are consistent with RSW policy for mental health crisis intervention and suicide prevention, which states that inmates who present a heightened risk of self-harm should be "transferred to a cell where they can be observed more closely until the inmate can be evaluated by a qualified mental health professional."

When Horn returned to RSW from Western State on February 28, 2022, Gerson Flores was the sergeant assigned to intake. In that role, Flores was responsible for flagging potential risk factors, noting medical and mental health conditions, assigning proper housing and monitoring, and otherwise ensuring that Horn was safely housed. However, although he knew that Horn was returning from a mental health hospitalization, Flores decided to perform a "soft booking" for her, in which he answered the intake questions independently and in advance to expedite the process.

During the soft booking, he answered "no" for "Inmate has Psychiatric History (note current drugs and treatment)," even though she was returning from Western State with a ten-day supply of psychiatric medications and had been diagnosed with bipolar disorder and schizophrenia. He also answered "no" for "Inmate has previous suicide attempts," despite the fact that Horn attempted suicide in RSW custody four times less than two weeks earlier. Flores then assigned Horn to a single occupancy "non-camera" cell, even though a cell equipped with camera surveillance was available. The non-camera cell had one window that would allow an officer to observe Horn only if they were standing directly outside the door. Flores did not

take any steps to ensure that she receive frequent monitoring as instructed by Western State during his soft booking process.

At 6:00 p.m. that day, Jordan Athey took over the intake role and was informed that Horn had returned from Western State. Athey did not switch Horn to a different cell or otherwise ensure that she was frequently monitored, despite feeling that it was "odd" that she had not been placed on suicide watch.

At 9:59 p.m., while Athey was still in charge of intake, another officer, Alexis Sullivan, placed a covering over Horn's cell window, completely obscuring Horn from view. Accordingly, despite instructions from Western State that Horn be observed frequently, Horn was now housed in a cell with no camera and with staff unable to see her unless they moved the window covering.

At 6:00 a.m. the next morning (March 1, 2022), Samantha Sulser took over as intake sergeant. Despite Horn's known attempts at self-harm, Sulser did not relocate Horn from that cell or remove the window covering.

At 11:13 a.m., David Miller, a lieutenant working as a supervisor at RSW, observed the window covering on Horn's cell and took no action to remedy the lack of monitoring.

Less than 20 minutes later, at 11:32 a.m., Horn was discovered unresponsive and pulseless, with marks around her neck from hanging herself. She was pronounced dead at 12:43 p.m.

Funkhouser initiated this action by filing a complaint on September 30, 2022, naming seven defendants. Compl., ECF No. 1. Defendants filed answers to the complaint and the parties began discovery. On December 22, 2023, Funkhouser filed a consent motion to amend

the complaint, indicating that, through discovery, she was able to identify the appropriate defendants. Pl.'s Mot., ECF No. 54. She asked to remove all defendants except one and add five new defendants. Id. The Honorable Joel C. Hoppe, United States Magistrate Judge, granted Funkhouser's motion for leave to amend on January 2, 2024. Order, ECF No. 56.

The amended complaint names six defendants: five correctional officers at RSW—Gerson Flores, Samantha Sulser, Jordan Athey, Alexis Sullivan, and David Miller—and Kaitlyn Brown, an employee of the Northwestern Community Services Board who Funkhouser alleges was responsible for providing clinical mental health services for Horn and failed to do so. Am. Compl., ECF No. 57, ¶¶ 13–18. The amended complaint asserts three causes of action: (1) a § 1983 claim against Flores and Brown for their deliberate indifference to Horn's risk of self-harm (Count One), (2) a negligence claim against all five correctional officers (Flores, Sulser, Athey, Sullivan, and Miller) (Count Two), and (3) a negligence claim against Brown (Count Three). Funkhouser seeks $5 million in compensatory damages.

On May 8, 2024, four of the five correctional officer defendants—Sulser, Athey, Sullivan, and Miller (together, the "Post-Intake Officers")—filed a motion to dismiss Count Two under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), ECF No. 79, and the fifth officer, Flores, filed a separate motion to dismiss Counts One and Two under Rule 12(b)(6), ECF No. 82. The sixth defendant, Kaitlyn Brown, filed an answer and did not join in the motions to dismiss. Answer, ECF No. 62. Funkhouser filed oppositions to both motions to dismiss, ECF Nos. 91, 92, defendants replied, ECF Nos. 96, 98, and the court heard argument on June 5, 2024. Accordingly, the issues have been fully briefed and the motions are ripe for resolution.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); see also Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a 'complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.'") (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (emphasis omitted)).

Meanwhile, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it." South Carolina v. United States, 221 F. Supp. 3d 684, 691 (D.S.C. 2016). Absent subject matter jurisdiction, a court must dismiss the action. See Evans v. B.F. Perkins Co., 166 F.3d 642, 653 (4th Cir. 1999). Dismissal under Rule 12(b)(1) is proper "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. at 647 (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)).

## III.   DISCUSSION

In their motions to dismiss, the correctional officer defendants argue that the court should dismiss Count Two—the negligence claim against them—for failure to state a claim and because they are shielded by the doctrine of sovereign immunity. ECF Nos. 79, 82. Flores, in his own motion, also asks the court to dismiss the other claim against him—a § 1983 claim—for failure to state a claim and under the doctrine of qualified immunity. The court addresses each in turn.

### A.  Count Two: Wrongful Death

#### 1.  Failure to State a Claim

Defendants first argue that the court should dismiss Funkhouser's wrongful death claim (Count Two) because Funkhouser has failed to plead facts sufficient to state a claim for negligence. Because the Post-Intake Officers and Flores offer different arguments in their two motions, the court will address them separately.

##### i.   Post-Intake Officers' Liability

In their motion, the Post-Intake Officers argue that they should not be held liable in this action because (1) they had no role in Horn's initial intake when she returned from Western State (that was Flores only) and had no duty to "second guess" it, and (2) they did not know of her risk of self-harm when they covered the window to her cell.[2] Funkhouser

---

[2] The Post-Intake Officers also argue that Count Two should be dismissed because Funkhouser improperly pleads a negligence claim, rather than a wrongful death claim, as required under Virginia law. However, the Fourth Circuit has made clear that "Virginia's wrongful death statute does not create a new cause of action, but only a right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death." Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991) (citations omitted). In other words, the wrongful death statute provides the right of action, but the cause of action is negligence. Here, Funkhouser pleads that defendants' negligence caused Horn's death and cites Virginia's wrongful death statute, Va. Code § 8.01-50, in two places in her complaint. Am. Compl., ¶ 1 ("This complaint asserts claims pursuant to 42 U.S.C. § 1983, as well as claims pursuant to Virginia's wrongful death statute, regarding the death of Kacey D. Horn.");

argues that she states a claim as to these defendants because she alleges that they knew or should have known about Horn's risk of self-harm—including through her multiple, recent suicide attempts at RSW—and that her continued placement in a non-camera cell with a cover on the window placed her in an imminent risk of harm, resulting in her death.

To state a claim for negligence in Virginia, a plaintiff must plead facts sufficient to show "(1) the identification of a legal duty of the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately caused by the breach." Talley v. Danek Med., Inc., 179 F.3d 154, 157 (4th Cir. 1999) (citing Locke v. Johns-Manville Corp., 221 Va. 951, 957, 275 S.E.2d 900, 904 (1981)). The requisite standard of conduct to avoid liability is "that of a reasonable man under like circumstances," which "is generally determined by a jury on a case-by-case basis." Id. at 157–58 (citations omitted).

Here, Funkhouser pleads that the Post-Intake Officers had a duty to "monitor[] inmates to ensure their safety and access to necessary care"—an obligation that continued after Flores' initial intake. Am. Compl., ¶ 73. Funkhouser also asserts that the officers breached that duty by "continuing to house [Horn] in a cell that did not allow for proper monitoring given her known history of attempts to self-harm, known mental health diagnoses, recent return from a commitment at Western State relative to her attempted self-harm, and instructions from Western State that she be frequently monitored and checked on to reduce her high-risk of self-harm" and "by placing a window obstruction over the only window in [Horn's] cell." Id. ¶¶ 74–75. Finally, she pleads that the harm—Horn's death—was reasonably

id. ¶ 83 ("Plaintiff brings this action pursuant to Virginia Code § 8.01-50 for damages as set forth in Virginia Code § 8.01-52."). Accordingly, the court will not dismiss the complaint on this basis.

foreseeable, "in light of specific instructions from Western State regarding her need for supervision, that eliminating the ability to directly observe [Horn] without moving the window covering would greatly increase the likelihood that she would attempt self-harm and greatly decrease the likelihood that a timely response would occur." Id. ¶ 76.

In addition, Funkhouser sufficiently pleads personal involvement as to each of the defendants at this stage. Namely, Funkhouser alleges that each of the Post-Intake Officers were working during the short time in which Horn was housed at RSW after returning from Western State before she died, that each of them had a duty to monitor inmates and ensure their safety while on their shift, and that they each failed to do so as to Horn, resulting in her death. Id. ¶¶ 55–59. Accordingly, Funkhouser has stated a plausible claim for negligence as to the Post-Intake Officers.[3] See, e.g., Sisson v. Piedmont Reg'l Jail Auth., No. 3:19-cv-602, 2020 WL 1307858, at *5 (E.D. Va. Mar. 19, 2020) (concluding that the plaintiff stated a claim for negligence where the correctional officer defendant owed a duty to provide reasonable care for inmates, knew or should have known about the inmate's medical condition after a recent hospitalization, and failed to adequately monitor the inmate or respond to his pleas for help, resulting in his death).

---

[3] Additional allegations specific to each defendant support the court's conclusion. Funkhouser pleads that (1) Athey failed to move Horn to a cell in which she could be better monitored, despite admitting that it was "odd" that she had not been placed on suicide watch, Am. Compl., ¶ 55; (2) Sullivan placed the covering over Horn's cell window, thereby completely obscuring Horn from view, id. ¶ 56; (3) Sulser, despite Horn's "known propensity to self-harm," failed to move Horn to another cell or remove the window covering as part of her role in intake, id. ¶ 57; and (4) Miller, a supervisor, observed the window covering but took no action to remedy it, id. ¶ 58.

### ii.  Flores' Liability

Flores, in his motion, argues that Count Two fails for two separate reasons: (1) another correctional officer's decision to cover Horn's cell window was a superseding act of negligence and (2) Funkhouser cannot recover for Horn's death because she took her own life.

### a.  Superseding Act of Negligence

Flores first argues that any alleged negligence on his part was superseded by another act of negligence—the covering of Horn's cell window. Virginia courts recognize that, when there is a "sufficient intervening act," "a defendant may be negligent and still not be liable for the resulting injury." Dorman v. State Indus., Inc., 292 Va. 111, 123, 787 S.E.2d 132, 139 (2016). However, for a defendant to escape liability, the intervening negligence "must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury." Id. (quoting Atkinson v. Scheer, 256 Va. 448, 454, 508 S.E.2d 68, 71–72 (1998)); see also Haga v. L.A.P. Care Servs., Inc., No. 1:01-cv-105, 2002 WL 1754485, at *3 (W.D. Va. July 29, 2002) (Jones, J.) ("A superseding cause is an event that produces an injury without the original wrongdoer's negligence contributing to the injury 'in the slightest degree.'" (quoting Scott v. Sims, 188 Va. 808, 817, 51 S.E. 2d 250, 253–54 (1949))). Furthermore, "an intervening cause which is 'reasonably foreseeable' from the defendant's negligence, or one that was 'put into operation' by the defendant's initial negligent act, does not sunder the defendant's liability." Buchanan v. Santek Env't of Va., LLC, No. 1:21-cv-006, 2021 WL 1866945, at *2 (W.D. Va. May 10, 2021) (Jones, J.) (quoting Hawkins v. Commonwealth, 64 Va. App. 650, 655, 770 S.E.2d 787, 789 (2015)).

Here, the court cannot conclude that Flores' negligence did not contribute to Horn's death "in the slightest degree." To the contrary, Flores' alleged negligence is central to Funkhouser's wrongful death claim. Specifically, Funkhouser alleges that Flores, through his mishandling of Horn's intake, placed Horn in a non-camera cell that prevented adequate monitoring, and that he failed to otherwise ensure that RSW staff properly monitored Horn while she was at high risk of self-harm, per Western State's instruction. If Flores had placed Horn in a cell that facilitated proper monitoring (e.g., a camera cell or at least one with more than one window) or taken steps to ensure that Horn was checked on frequently, officers would have had alternative ways to monitor Horn even when the window was covered. See Adams v. NaphCare, Inc., No. 2:16-cv-229, 2016 WL 10455885, at *7 (E.D. Va. Dec. 19, 2016), R&R adopted, 232 F. Supp. 3d 866 (E.D. Va. 2017) (concluding that a hospital employee's failure to process an inmate's transfer to a state mental hospital was not superseded by the jail's subsequent failure to give him adequate care). Accordingly, regardless of the window covering, Funkhouser plausibly claims that Flores' conduct was a proximate cause of Horn's death, and the court will not dismiss the negligence claim as to Flores on that basis.

### b. Illegal Act Doctrine

Flores also argues that Funkhouser's claim is barred under the illegal act doctrine because Horn committed the crime of suicide. "Under Virginia law, 'it is well settled that, as a general rule, a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequence of that act.'" Brown v. Harris, 240 F.3d 383, 386 (4th Cir. 2001) (quoting Wackwitz v. Roy, 244 Va. 60, 64, 418 S.E.2d 861, 864 (1992)). To commit the crime of suicide in Virginia, a person must "(1) take [their] own

12

life; (2) be 'of years of discretion'; and (3) be of 'sound mind.'" Id. (quoting Wackwitz, 244 Va. at 65, 418 S.E.2d at 864–65). "A person is of 'sound mind' if competent and sane." Id. (citing Hill v. Nicodemus, 979 F.2d 987, 990 (4th Cir. 1992)). Beyond that, however, "[p]inpointing a precise definition of the term 'unsound mind' proves elusive; it is an amorphous concept that lacks a concrete definition in Virginia law." Howard v. Harris, 80 Va. App. 365, 378, 897 S.E.2d 742, 748 (2024). Flores argues that Horn committed the crime of suicide because Funkhouser failed to plead that Horn was not of "sound mind" when she died. Funkhouser contends that the complaint is replete with allegations regarding Horn's deteriorating mental condition, sufficient to establish that she was of unsound mind at the time of her death.

Indeed, Funkhouser's allegations demonstrate a person in severe mental distress—she suffered from hallucinations from a childhood friend named Sally who told her to hurt herself and others, she urinated on herself and tried to commit suicide by sticking her head in the jail cell toilet, she was diagnosed with borderline personality disorder, schizophrenia, and self-injurious behavior, and she otherwise "suffered from serious mental health conditions that prevented her from making proper decisions to ensure her own safety upon her return from Western State." Am. Compl., ¶ 64; see Schieszler v. Ferrum Coll., 236 F. Supp. 2d 602, 614 (W.D. Va. 2002) (Kiser, J.) (concluding that the plaintiff sufficiently alleged that the decedent was of unsound mind by pleading that the college "required [the decedent] to enter counseling as a condition of his continued enrollment and that he had threatened suicide and physically injured himself in the days before his death"). Accordingly, the court concludes that

Funkhouser has sufficiently pled that Horn was of unsound mind when she took her own life, and the illegal act doctrine will not bar Funkhouser's recovery at this stage.[4]

## 2.    Sovereign Immunity

Because Funkhouser has stated a claim for wrongful death as to all correctional officer defendants, the court must now turn to defendants' alternative argument that they are entitled to sovereign immunity as employees of RSW. To do so, the court must first determine whether RSW—a regional jail—is protected by sovereign immunity. If RSW is not protected, the inquiry ends there. If sovereign immunity does apply to RSW, the court must also assess whether that protection extends to defendants.

### i.    Immunity for RSW

"The doctrine of sovereign immunity is 'alive and well' in Virginia." Fines v. Rappahannock Area Cmty. Servs. Bd., 301 Va. 305, 313, 876 S.E.2d 917, 922 (2022) (quoting Messina v. Burden, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984)). It bars state tort claims against the Commonwealth of Virginia "unless it consents or a statute exists that grants the necessary consent." Id. (citations omitted). As relevant here, the protection extends to "public entities where the claims arise from 'governmental' as opposed to 'proprietary' functions."

---

[4] At the June 5, 2024, hearing on these motions, counsel for Funkhouser informed the court that he wished to file an amended complaint clarifying that Funkhouser was pleading gross negligence as to Flores. The court agrees that the allegations in the complaint state a claim for gross negligence as to Flores and will **GRANT** Funkhouser's request for leave to file a second amended complaint that makes that clear. See, e.g., Dowdy, 2014 WL 2002227, at *5 (concluding that, because the officers were aware of the inmate's suicidal intent and because they should have realized the need to protect him as a result, the plaintiff had pled sufficient facts for gross negligence); Sisson, 2020 WL 1307858, at *5 (the plaintiff stated a claim for gross negligence because the defendant "knew or should have known of Sisson's medical condition, was in the booking area during the events at issue, was aware that 15-minute checks were ordered to be performed, failed to perform the 15-minute checks or order anyone else to do so, signed off on falsified records, and failed to respond to Sisson's pleas for help and assistance"); Thornhill, 2016 WL 8737358, at *13 (explaining that the plaintiff stated a claim for gross negligence because they had sufficiently pled deliberate indifference, which requires "something more than mere negligence").

Haleem v. Quinones, No. 5:17-cv-003, 2017 WL 4400767, at *3 (W.D. Va. Sept. 30, 2017) (Dillon, J.). However, while it is well-established that "the operation of a jail is a governmental function" and "that a jail maintained by a single jurisdiction is entitled to sovereign immunity," id., "courts throughout Virginia are split as to whether regional jail authorities are entitled to the protection of sovereign immunity, and neither the Fourth Circuit nor the Supreme Court of Virginia have addressed this issue," Sisson, 2020 WL 1307858, at *6 (citing Thornhill v. Aylor, No. 3:15-cv-024, 2017 WL 2304225, at *2 (W.D. Va. May 25, 2017) (Conrad, J.)); see also Haleem, 2017 WL 4400767, at *2 ("The subject of whether a regional jail authority is entitled to sovereign immunity is an unsettled question . . . .").

Within this district, several judges—including this court—have recently assessed the issue and concluded that regional jails are entitled to sovereign immunity. See Davis v. Lilly, No. 7:23-cv-152, 2023 WL 6565288, at *9 (W.D. Va. Oct. 10, 2023) (Ballou, J.) (joining the "the majority of the judges in the Western District of Virginia" by "finding that a regional jail authority is entitled to sovereign immunity"); Haleem, 2017 WL 4400767, at *3 (Dillon, J.); Tilson v. Humphrey, No. 5:19-cv-033, 2019 WL 6902677, at *7 (W.D. Va. Dec. 18, 2019) (Urbanski, J.); Donovan v. Buchanan Cnty. Sheriff's Off., No. 1:21-cv-005, 2022 WL 1580108, at *8 (W.D. Va. May 19, 2022) (Jones, J.). In fact, this court had previously concluded that sovereign immunity did not apply to a regional jail, Boren v. Northwestern Regional Jail Authority, No. 5:13-cv-013, 2013 WL 5429421, at *5 (W.D. Va. 2013), but, following a close review of the state of the law—including Judge Dillon's intervening Haleem decision—changed course and determined that regional jail authorities are protected by sovereign immunity. Tilson, 2019 WL 6902677, at *7.

15

Meanwhile, a growing consensus seems to be emerging in the Eastern District of Virginia that regional jails are not entitled to sovereign immunity. See, e.g., Rucker v. Piedmont Reg'l Jail Auth., No. 3:21-cv-412, 2021 WL 3863346, at *6 (E.D. Va. Aug. 30, 2021) (Novak, J.) (recognizing that federal courts in Virginia "remain split as to whether regional jails . . . enjoy sovereign immunity," but that the "majority rule" among those cases is that regional jails are not entitled to sovereign immunity); Sams v. Armor Corr. Health Servs., Inc., No. 3:19-cv-639, 2020 WL 5835310, at *13 (E.D. Va. Sept. 30, 2020) (Lauck, J.) (explaining that, of the eight federal court cases that have concluded that regional jails are not entitled to sovereign immunity in Virginia, seven were from the Eastern District). But see Costine v. Correct Care Sols., LLC, No. 2:19-cv-053, 2019 WL 2775491, at *6 (E.D. Va. July 2, 2019) (Doumar, J.) (concluding that the regional jail is protected by sovereign immunity).

Despite these conflicting conclusions, courts "agree that the outcome turns on whether a regional jail authority operates as a municipal corporation"—the framework for which is well-established. Davis, 2023 WL 6565288, at *9; see also Tilson, 2019 WL 6902677, at *5 ("Whether a regional jail authority is entitled to sovereign immunity turns on whether it operates as a municipal corporation.").[5] In Hampton Roads Sanitation Dist. Comm'n v. Smith, 193 Va. 371, 376, 68 S.E.2d 497, 500 (1952), the Supreme Court of Virginia directed courts to "concentrat[e] on two basic factors" to determine whether an entity is a municipal corporation entitled to immunity. First, "how many attributes of a municipal corporation does the entity

---

[5] This is the case because "[t]he Fourth Circuit has already concluded that regional jail authorities . . . do not constitute arms of the state." Rucker, 2021 WL 3863346, at *6; see also Heckenlaible v. Virginia Reg'l Peninsula Jail Auth., No. 4:06-cv-025, 2006 WL 3196750, at *2 (E.D. Va. Nov. 1, 2006) (explaining that an entity may establish that it is entitled to immunity because it is "an arm or agency of the state" or a "municipal corporation").

in dispute possess?" Id. Second, "in the light of this initial consideration, what is the particular purpose for which it is sought to determine whether or not a municipal corporation is present?" Id.

For the first part of the test, the Hampton Roads court identified six attributes of a municipal corporation:

> (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;
> (2) Creation to serve a public purpose;
> (3) Power to have a common seal, to sue and be sued, to enter into contracts to acquire, hold, and dispose of its revenue, personal, and real property;
> (4) Possession of the power of eminent domain;
> (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; and
> (6) Management of the corporation vested in a board of directors or a commission.

Haleem, 2017 WL 4400767, at *4 (quoting City of Richmond v. Richmond Metro. Auth., 210 Va. 645, 647, 172 S.E.2d 831, 832 (1970)). These attributes "focus on elements necessarily contained in the enabling legislation, such as the type of entity created (attribute one), the purpose of the entity (attribute two), the powers granted the entity (attributes three, four and five), and the management of the entity (attribute six)." Fines, 301 Va. at 317, 876 S.E.2d at 925. They "are designed to assist the finder of fact in determining whether the entity is a municipal corporation, 'clothed with [the] essential powers to serve as a political subdivision of the Commonwealth,' or 'a mere auxiliary of a city or county government.'" Id. (quoting Hampton Roads, 193 Va. at 377, 68 S.E.2d at 500).

In the context of regional jails, courts generally agree—and it is undisputed here—that these entities lack two of the six attributes of municipal corporations: (1) "creation as a body corporate and politic and as a political subdivision of the Commonwealth," and (2) possession of the power of eminent domain. See, e.g., Davis, 2023 WL 6565288, at *9. In Tilson, the court revisited its prior conclusion that regional jail authorities are not protected by sovereign immunity because of intervening jurisprudence regarding this part of the inquiry—specifically, that an entity need not possess all six attributes to satisfy the first factor:

> In Boren, this court, looking to Heckenlaible [v. Virginia Reg'l Peninsula Jail Auth., No. 4:06-cv-025, 2006 WL 3196750, (E.D. Va. Nov. 1, 2006)], held that an entity "could not be treated as a municipal corporation if it did not possess all six of [the] essential attributes of a municipal corporation." 2013 WL 54294421, at *4. At the time, this was the state of the law; since this decision, the court finds that the law has evolved such that an entity need not possess all six essential attributes to be treated as a municipal corporation. As Dowdy v. Pamunkey Reg'l Jail Auth., [No. 3:14-CV-003, 2014 WL 2002227, at *3 (E.D. Va. May 15, 2014),] held, regional jail authorities possess "many characteristics typical of local governments," including "a quintessentially public purpose," a governing body, the ability to "acquire property, appoint officers and employees, make contracts, undertake various projects, accept governmental grants and loans, and sue and be sued," an immunity from taxation, and state reimbursement for construction and operational costs. 2014 WL 2002227, at *3. These characteristics entitle it to treatment as a municipal corporation for purposes of sovereign immunity.

Tilson, 2019 WL 6902677, at *7. Indeed, it is now well-settled that an entity need not possess all six Hampton Roads attributes to qualify as a municipal corporation. See Fines, 301 Va. at 316, 876 S.E.2d at 925 ("It is not essential that an entity possess all of these attributes to qualify as a municipal corporation; rather, we have held that an entity may be deemed a municipal

corporation 'if it possesses <u>enough</u> of the essential attributes.'" (quoting <u>York Cnty. v. Peninsula Airport Comm'n</u>, 235 Va. 477, 481 n.1, 369 S.E.2d 665, 667 (1988))).

However, the discord among courts now is the significance of those missing attributes to the overall result. While additional courts have agreed with the approach in <u>Haleem</u> and <u>Tilson</u>, reaching the same conclusion that the attributes that regional jail authorities possess entitle them to sovereign immunity, <u>see, e.g.</u>, <u>Davis</u>, 2023 WL 6565288, at *9; <u>Donovan</u>, 2022 WL 1580108, at *8; <u>Wendt v. Overton</u>, 98 Va. Cir. 220, at *3 (2018) ("The Court agrees with the analysis of the U.S. District Court in <u>Haleem</u>."), Funkhouser argues that this court should again revisit its analysis because—even though an entity need not possess all six attributes—the attributes that they are missing are "intrinsic" and dispositive, <u>see</u> <u>Sams</u>, 2020 WL 5835310, at *15 ("[T]he Court determines that because PRJA lacks two intrinsic attributes of municipal corporations—creation as a political subdivision and the power of eminent domain—it should not be viewed as one.").

Funkhouser also argues that the court should look to the Virginia Supreme Court's recent holding that immunity from tort liability is "a matter of substantive law," rather than procedural law, which goes to the second part of the <u>Hampton Roads</u> test and, as she suggests, further pushes the analysis toward her conclusion. <u>Fines</u>, 301 Va. at 319, 876 S.E.2d at 926. Accordingly, the court will assess these cases to determine whether they warrant a departure from the court's analysis in <u>Tilson</u>. For the reasons provided below, the court concludes that they do not.

First, as to the missing attributes, a series of cases have reasoned that the two attributes that regional jail authorities like RSW do not possess—designation as a political subdivision

and the power of eminent domain—are the "most intrinsic to municipal corporations" and,

accordingly, "their absence prevents [regional jail authorities] from claiming the sovereign

immunity afforded municipal corporations." <u>Sams</u>, 2020 WL 5835310, at *15. This reasoning

was first articulated in a 2015 case, <u>Heywood v. Virginia Peninsula Reg'l Jail Auth.</u>, No. 2:15-

cv-195 (E.D. Va. July 21, 2015) (Miller, M.J.), <u>R&R adopted</u>, 2015 WL 5026188, at *6 (Aug.

21, 2015), in which the court compared the attributes that the regional jail possessed to those

it was missing and concluded that the significance of those it missed were too important for

the court to conclude that it could be a municipal corporation.

> [T]he two attributes VPRJ lacks are those most intrinsic to
> municipal corporations, namely the General Assembly's
> designation as a body politic or political subdivision of the
> Commonwealth and the power of eminent domain. <u>See, e.g.</u>,
> <u>Short Pump Town Ctr. Comm. Dev. Auth. v. Hahn</u>, 554 S.E.2d
> 441, 446 (Va. 2001) ("[T]he General Assembly clearly knows how
> to denominate an authority as a 'political subdivision' when it
> wishes to do so."); <u>Light v. City of Danville</u>, 190 S.E. 276, 281
> (Va. 1937) ("The power of eminent domain is a most important
> incident of the power of a sovereign."). By contrast, most of the
> attributes which VPRJ does enjoy are found in private
> corporations as well. Fully private jails have the power to sue and
> be sued, to enter into contracts, to hold and dispose of real and
> personal property, to borrow money and issue bonds, and to
> manage their affairs by a board of directors.

<u>Heywood</u>, 2015 WL 5026188, at *7. Multiple cases assessing this issue have found this analysis

persuasive. <u>See, e.g.</u>, <u>Sams</u>, 2020 WL 5835310, at *15; <u>McCaffrey v. Virginia Peninsula Reg'l</u>

<u>Jail Auth.</u>, No. 4:18-cv-154, 2019 WL 5445752, at *8 (E.D. Va. Oct. 4, 2019), <u>R&R adopted</u>,

2019 WL 5445296 (E.D. Va. Oct. 23, 2019) ("[B]ecause VPRJA is not a political subdivision

and does not have the power of eminent domain, it is not a municipal corporation under the

first factor.").

20

In so doing, these cases conclude that, "regardless of whether an entity requires all six attributes, an entity cannot be a municipal corporation if it [is not a political subdivision and because it lacks the power of eminent domain] as those attributes are the 'most intrinsic to municipal corporations.'" Wright v. Virginia Peninsula Reg'l Jail Auth., No. 2:19-cv-189, 2020 WL 1055665, at *13 (E.D. Va. Mar. 4, 2020) (quoting Heywood, 2015 WL 5026188, at *6). In other words, while courts agree that the test does not require satisfaction of all six attributes, certain of these courts now delineate some attributes as necessary in order to be deemed a municipal corporation. Heywood, 2015 WL 5026188, at *6–7 (acknowledging that "it is not a condition precedent that all six [attributes] be present to conclude that an entity is a municipal corporation," and then classifying two of the attributes as required). However, just as the Supreme Court of Virginia has declined to require that an entity satisfy all six attributes, so, too, has it not created a hierarchy of which attributes (or lack thereof) are dispositive to the analysis. See Sams, 2020 WL 5835310, at *15 n.17 (acknowledging that the "Supreme Court of Virginia has never utilized this 'most intrinsic' attribute language").

Indeed, in the time since these cases have been decided, the Supreme Court of Virginia has issued an opinion applying the Hampton Roads test, in which it determined that a community services board also lacked the same attributes of a regional jail—it was not a political subdivision and did not have the power of eminent domain. Fines, 301 Va. at 317–19, 876 S.E.2d at 925–26. As to the other four attributes, the court concluded that the community services board satisfied two in full—it was created to serve a public purpose and management was vested in a board of directors or a commission—but it only partially possessed the remaining two attributes: the "power to have a common seal, to sue and be

sued, to enter into contracts, to acquire, hold and dispose of its revenues, personal and real property, and the "power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state." Id.

Notably, after determining which attributes the entity possessed, the court did not deem any attributes dispositive to the inquiry, as the Heywood line of cases would suggest. Instead, the court noted that the appropriate inquiry for assessing the missing attributes is that "the more statutory autonomy the entity possesses and exercises the more likely it is to be declared a municipal corporation." 301 Va. at 319, 876 S.E.2d at 926. Through that lens, the court concluded that, given the missing attributes, the community services board "looks less like a municipal corporation and more like an auxiliary of the establishing localities." Id.

Accordingly, in light of the Virginia Supreme Court's recent analysis in Fines, the court is not inclined to conclude that two of the attributes are so intrinsic as to be required. See York Cnty. v. Peninsula Airport Comm'n, 235 Va. 477, 481 n.1, 369 S.E.2d 665, 667 (1988) (explaining that an entity may be a municipal corporation "if it possesses enough of the essential attributes" (emphasis added)). Instead, the court will continue to follow the analysis set forth in Dowdy and Haleem, among others, which instruct that the many attributes that regional jail authorities, like RSW, possess—including "a quintessentially public purpose," a governing body, the ability to "acquire property, appoint officers and employees, make contracts, undertake various projects, accept governmental grants and loans, and sue and be sued," arrest powers, the ability to issue tax-free bonds, immunity from taxation, and state reimbursement for construction and operational costs and funding for part of employee

salaries—weigh in favor of a finding that RSW is a municipal corporation on the first part of the <u>Hampton Roads</u> inquiry. <u>Dowdy v. Pamunkey Reg'l Jail Auth.</u>, No. 3:14-cv-003, 2014 WL 2002227, at \*3 (E.D. Va. May 15, 2014).

As to the second part of the <u>Hampton Roads</u> test, Funkhouser argues that <u>Fines</u> is also instructive because it determined that the issue of immunity from tort liability is a matter of substantive law, as opposed to procedural law. Because the Supreme Court of Virginia has previously instructed that "there is more likelihood of holding an agency to be a municipal corporation when the pivotal point is one of procedure than there is when a question of substantive law is involved," <u>Hampton Roads</u>, 193 Va. at 377, 68 S.E.2d at 501 (citations omitted), Funkhouser argues that <u>Fines</u>' holding on this point must mean that the regional jail is not a municipal corporation.

To be sure, this analysis in <u>Fines</u> is important because it confirms that the substance-versus-procedure issue plays a role in the <u>Hampton Roads</u> test. However, contrary to Funkhouser's argument, it does not foreclose a conclusion that RSW is a municipal corporation. <u>Hampton Roads</u>, 193 Va. at 377, 68 S.E.2d at 501 (stating only that a procedural issue makes it "more likel[y]" that an entity will be deemed a municipal corporation). Moreover, while this issue was one of first impression for the Supreme Court of Virginia, multiple courts have already reached this conclusion and incorporated it into its <u>Hampton Roads</u> analysis, as the <u>Fines</u> court itself acknowledges. <u>Fines</u>, 301 Va at 319, 876 S.E.2d at 926 ("Although we have never specifically identified whether immunity from tort liability is a substantive or procedural matter, we are guided by the fact that federal courts have consistently described 'the nature and scope of a claimed immunity' as a matter of 'substantive state law.'").

In other words, this analysis does not disturb earlier precedent on the issue, as it only confirms the approach that courts have already followed. See, e.g., Heywood, 2015 WL 5026188, at *7 ("Undoubtedly, the application of the doctrine of sovereign immunity [which] protects municipalities from tort liability, involves a question of substantive law." (internal citations and quotations omitted)); Sams, 2020 WL 5835310, at *18 (same); Finamore v. Trent, 95 Va. Cir. 38, at *10 (2016) ("Because this is a substantive question of law, this factor further weighs against treating either jail in this case as a municipal corporation."); Wright, 2020 WL 1055665, at *14 ("The reason here—the pivotal issue in the case—is one of substantive law; VPRJA claims it is protected from this tort claim by sovereign immunity."). The court sees no reason to depart from its prior analysis on this basis.

Accordingly, even though the pivotal issue is one of substantive law, because RSW possesses "many characteristics typical of local governments" and the operation of a jail is a governmental function, the court concludes that RSW is a municipal corporation under Virginia law and is therefore entitled to sovereign immunity.

### ii.  Immunity for Defendants

However, because RSW is not a defendant in this case, the ultimate issue is whether the immunity extends to the correctional officers. Haleem, 2017 WL 4400767, at *4 ("Although the employee's immunity derives from his governmental employer, the employee's immunity is not co-extensive with that of his employer."); Dowdy, 2014 WL 2002227, at *3 ("An employee's immunity derives from the entity for which the employee works, and the employee has sovereign immunity only while performing functions for which the locality itself

has immunity."); <u>Tilson</u>, 2019 WL 6902677, at *7 ("The determination that MRRJA is immune from suit does not automatically dictate that MRRJA employees are similarly immune.").

The Supreme Court of Virginia has outlined a four-part test for determining whether sovereign immunity extends to employees of a protected entity. Under the test, the reviewing court must consider "(1) the nature of the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control exercised by the state over the employee, and (4) whether the alleged negligent act involved judgment and discretion." <u>Dowdy</u>, 2014 WL 2002227, at *4 (quoting <u>Messina v. Burden</u>, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984)). In addition, even if a court determines that sovereign immunity extends to the employee, that employee enjoys immunity only as to simple negligence claims. See <u>Octave v. Wade</u>, No. 3:16-cv-338, 2017 WL 465467, at *2 (E.D. Va. Feb. 3, 2017).[6]

In the context of correctional officers, courts generally agree that the first three <u>Messina</u> factors are satisfied and that the analysis hinges on the fourth factor—"whether the alleged negligent act involved judgment and discretion." <u>Dowdy</u>, 2014 WL 2002227, at *4 (referring to the fourth <u>Messina</u> as "typically dispositive"); <u>Dallas v. Craft</u>, No. 3:21-cv-349, 2022 WL 2079312, at *28 (E.D. Va. June 9, 2022) (noting that "the applicability of sovereign immunity, 'as is often the case, turns on the fourth factor'" (quoting <u>Riddick v. Watson</u>, 503 F. Supp. 3d 399, 426 (E.D. Va. 2020))). In <u>Tilson</u>, for example, this court explained the issue as follows:

> It is well established that the operation of a regional jail is a <u>per se</u> governmental function and that Virginia has a significant interest in the provisions of adequate medical care and proper

---

[6] Because the court is allowing Funkhouser to file a second amended complaint that clarifies that she is pleading gross negligence as to Flores, Flores is not entitled to the defense of sovereign immunity at this stage. <u>Thornhill</u>, 2016 WL 8737358, at *13 ("[I]t is well-established that state officials are not entitled to sovereign immunity when they are accused of an intentional tort or acts constituting gross negligence."). Accordingly, the court will assess sovereign immunity as to the other correctional officer defendants only.

supervision of inmates. <u>See</u> Va. Code §§ 53.1-85.7, 53.1-32; 53.1-
26; 53.1-133.01. And numerous cases have found that sufficient
state involvement and control in the actions of state-employed
public health employees to support the extension of sovereign
immunity. <u>See</u> <u>Coppage v. Mann</u>, 906 F. Supp. 1025, 1048 (E.D.
Va. 1995); <u>Lohr v. Larsen</u>, 246 Va. 81, 86, 431 S.E.2d 642, 645
(1993). Whether the individual defendants at issue here will be
shielded from Tilson's claims of ordinary negligence will
therefore turn on whether their acts alleged by the Amended
Complaint "involved judgment and discretion."

2019 WL 6902677, at *7; <u>see also</u> <u>Dallas</u>, 2022 WL 2079312, at *28 ("[S]upervising and

managing inmates . . . 'fall[] cleanly within the governmental function of housing inmates and

properly operating jails,' . . . [and] the Commonwealth has 'a great interest in—and control

over—the housing of inmates and the proper operation of a jail.'" (internal citations omitted)).

The Post-Intake Officers agree that this is the critical factor here, and they argue that

sovereign immunity extends to them because the negligence at issue—properly monitoring

and housing Horn—involved judgment and discretion. For her part, Funkhouser asserts that

additional discovery is required, including, for example, on the issue of whether defendants

were required to exercise judgment and discretion in complying with RSW internal policy and

state regulations regarding the supervision of inmates. <u>See, e.g.</u>, 6 Va. Admin. Code § 15-

40-1045 (requiring that "[a]ll inmate housing areas shall be inspected a minimum of twice per

hour at random intervals between inspections," and that "[n]o obstructions shall be placed in

the bars or windows that would prevent the ability of staff to view inmates or the entire

housing area"); Am. Compl., ¶¶ 41–42 (citing RSW policy that staff must follow for "mental

health crisis intervention and suicide prevention").

Indeed, as prior courts have explained, the existence of regulations and guidelines alone

does not answer the question of whether applying those instructions involve an exercise of

discretion and judgment. <u>See, e.g.</u>, <u>Dowdy</u>, 2014 WL 2002227, at *4. Accordingly, the court agrees that additional development of the factual record is required to determine whether the Post-Intake Officers exercised discretion and judgment in complying with these policies—among others—and the court will not extend sovereign immunity to the Post-Intake Officers at this stage.[7]

### B.  Count One: Deliberate Indifference as to Flores

Flores, in his motion, also asks the court to dismiss Count One—a deliberate indifference claim under 42 U.S.C. § 1983—for failure to state a claim and because he is entitled to qualified immunity.

#### 1.  Failure to State a Claim

Count One alleges that Flores acted with deliberate indifference to a substantial risk of harm posed by Horn's mental health condition, amounting to a violation of her Fourteenth Amendment rights.[8] Traditionally, to demonstrate deliberate indifference, a pretrial detainee must show that (1) she has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and (2) the defendant "had actual knowledge of the

---

[7] In so doing, the court notes that it does not find persuasive the Post-Intake Officers' argument that Funkhouser has already had the opportunity to discover these facts. While it is true that Funkhouser engaged in discovery before filing the first amended complaint, that discovery was conducted with an almost entirely different set of defendants. <u>Compare</u> Compl., ECF No. 1, <u>with</u> Am. Compl., ECF No. 57 (replacing six of the seven defendants with five new defendants).

[8] Because Horn was a pretrial detainee at the time of her death, she brings her § 1983 claim pursuant to the Fourteenth Amendment, instead of the Eighth Amendment. <u>See</u> <u>White v. Thompson</u>, 639 F. Supp. 3d 613, 622 (S.D.W. Va. 2022) ("Although deliberate indifference is typically considered an Eighth Amendment claim, where the claimant 'was a pretrial detainee and not a convicted prisoner at the time of the alleged denial, this claim is governed by the due process clause of the fourteenth amendment rather than the eighth amendment.'" (quoting <u>Martin v. Gentile</u>, 849 F.2d 863, 870 (4th Cir. 1988))).

27

plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." Gordon v. Schilling, 937 F.3d 348, 356–57 (4th Cir. 2019).

However, the Fourth Circuit—joining the Second, Sixth, Seventh, and Ninth Circuits—recently concluded that, to state a claim for deliberate indifference under the Fourteenth Amendment, a "plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." Short v. Hartman, 87 F. 4th 593, 611 (4th Cir. 2023). Instead, "it is sufficient that the plaintiff show that the defendant's action or inaction was . . . 'objectively unreasonable': that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." Id. (quoting Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015)). Accordingly, the court announced the new test as follows,

> To state a claim for deliberate indifference to a medical need, . . . a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

Short, 87 F. 4th at 611; see also Tolbert v. Haug, No. 7:23-cv-533, 2024 WL 1719936, at *3 (W.D. Va. Apr. 22, 2024) (quoting Short, 87 F. 4th at 611). Flores argues that Funkhouser has failed to satisfy the third element—that Flores knew or should have known about Horn's

28

mental health condition and that Flores' subsequent "action or inaction posed an unjustifiable high risk of harm" given that condition.[9]

Contrary to Flores' contention, however, it is clear to the court that Funkhouser has stated a claim for deliberate indifference at this stage. Principally, Funkhouser alleges that Flores' role in "intake" at the time of Horn's return from Western State included responsibilities such as "flagging potential risk factors, noting medical and mental health conditions, assigning proper housing and monitoring, and otherwise ensuring that [Horn] was safely housed in the facility." Am. Compl. ¶ 47. In other words, put simply, it was Flores' job to learn about an inmate's medical and mental health status upon their arrival to RSW, and to house them accordingly. In light of that, and given the many indicators of her mental distress—including her multiple suicide attempts at RSW less than two weeks earlier, her eleven-day hospitalization as a result of those suicide attempts, her mental health diagnoses and medical prescriptions aimed at addressing those diagnoses, and Western State's instruction that she be monitored frequently upon her return to RSW—Funkhouser has sufficiently pled that Flores knew or should have known about Horn's mental health condition and that his failure to ensure that she was adequately monitored "posed an unjustifiable high risk of harm" given her condition. Accordingly, the court will not grant Flores' motion to dismiss on this basis.

---

[9] Flores does not dispute that Horn's risk of suicide is an objectively serious medical condition—a conclusion that is well-supported by Fourth Circuit precedent. See Short, 87 F. 4th at 612 ("A substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by the first prong' of the deliberate indifference test." (quoting Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001))).

## 2. Qualified Immunity

Flores also argues that he is entitled to protection under qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The inquiry for determining whether a government official is protected by qualified immunity is two-pronged: The court must first determine whether the defendant's conduct violated a constitutional right and, if so, the court must then assess whether that right was "clearly established" at the time of the alleged violation. Nazario v. Gutierrez, 103 F.4th 213, 230 (4th Cir. 2024) (citations omitted).

As explained above, Funkhouser has sufficiently pled that Flores was deliberately indifferent to Horn's serious mental health condition, in violation of her Fourteenth Amendment rights. Accordingly, the court must turn to the second question—whether that right was clearly established at the time of the violation. For a constitutional right to be "clearly established," "its contours 'must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right.'" Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000) (explaining that the court must "evaluate whether a reasonable official would have understood that the conduct at issue violated the clearly established right").

At the time of Horn's imprisonment, courts "had made clear that pre-trial . . . inmates have a right to adequate medical care for serious illness." Dowdy, 2014 WL 2002227, at *7; see Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (concluding that pre-trial detainees

have a right "to medical attention, and prison officials violate a detainee's right to due process [under the Fourteenth Amendment] when they are deliberately indifferent to serious medical needs"). Moreover, "[i]t has been long established in the Fourth Circuit that suicide risk constitutes a serious medical condition and that 'prison officials have a duty to protect prisoners from self-destruction or self-injury.'" Reid v. Newton, No. 3:13-cv-572, 2014 WL 1493569, at *16 (E.D. Va. Apr. 14, 2014) (quoting Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992), as amended (July 7, 1992)). Accordingly, these rights were clearly established at the time of the incident.[10]

The court also concludes that a reasonable person would have understood that the conduct at issue violated that right. In Dowdy, for example, two sheriffs brought the decedent to a regional jail and told the intake officer that the decedent had expressed suicidal intentions. 2014 WL 2002227, at *1. The officer checked the decedent into the jail and took him to an EMT on duty, who, despite his awareness of the decedent's suicidal intent, failed to give him medical treatment and assigned him to a standard cell, where he killed himself four days later. Id. The court reasoned that, because the officers "knew of [the decedent's] suicidal tendencies," "any reasonable officer would have known of the obligation to provide medical care to [the decedent]." Id. at *7.

Similarly, here, Funkhouser alleges that, "[d]espite their actual knowledge of [Horn's] risk of self-harm, Defendants Flores and Brown failed to do anything upon her return from

---

[10] Flores' attempt to narrow the inquiry to a "right to a cell with a camera" is not persuasive. Funkhouser pleads that Flores, if not deliberately indifferent to Horn's needs, would have placed her in a cell that allowed adequate monitoring (e.g., a camera cell). However, the right that Funkhouser alleges was violated was Horn's right to adequate care given her serious medical condition.

Western State to ensure that [Horn's] serious medical health needs were monitored or that any precautions whatsoever were in place to reduce her high risk for self-harm." Am. Compl., ¶ 65. Accordingly, like in Dowdy, "any reasonable officer would have known of the obligation to provide medical care" to Horn, and Flores is not entitled to qualified immunity at this stage. See also Reid, 2014 WL 1493569, at *16 (concluding that the officer "ha[d] not provided a factual basis to conclude that a reasonable officer in her position would have believed it reasonable to forego all suicide prevention measures in the face of actual knowledge that Johnson had attempted suicide less than twenty-four hours prior").

## IV. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the amended complaint, ECF Nos. 79, 82, are **DENIED**. In addition, Funkhouser's oral motion to file a second amended complaint is **GRANTED**. Funkhouser may file a second amended complaint, clarifying that she pleads gross negligence as to Flores, within fourteen (14) days.

An appropriate order will be entered.

Entered: July 26, 2024

Michael F. Urbanski
Senior United States District Judge